UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LAURA A. WEBER, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:10-CV-00359 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
|     Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Laura Weber appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for additional proceedings in accordance with this Opinion.

**I.  PROCEDURAL HISTORY**

Weber applied for SSI and DIB in November and December 2006, respectively, alleging disability beginning on January 3, 2006. (Tr. 19, 154-56, 159-60.) The Commissioner denied her application initially and upon reconsideration, and Weber requested an administrative hearing. (Tr. 76-93, 97-110.) A hearing was conducted by Administrative Law Judge ("ALJ") Michelle Lindsay on September 14, 2009, at which Weber (who was represented by a "non-attorney

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

representative") and a vocational expert testified. (Tr. 38-67.)  On December 11, 2009, the ALJ rendered an unfavorable decision to Weber, concluding that she was not disabled because she could perform a significant number of jobs in the economy despite the limitations caused by her impairments. (Tr. 16-32.)  The Appeals Council denied her request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-15.)

On October 15, 2010, Weber filed a complaint with this Court, seeking relief from the Commissioner's final decision. (Docket # 1.)  In her appeal, Weber alleges two flaws with the Commissioner's decision: (1) that the ALJ improperly evaluated the opinion of her treating psychiatrist, Dr. Flueckiger; and (2) that the ALJ improperly discounted the credibility of her symptom testimony about her mental limitations.[2] (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 16-22.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Weber was forty-six years old; had obtained her GED and taken some college classes; and possessed work experience as a server, cargo handler, cashier, screen printer, and laborer. (Tr. 16, 45, 159, 253, 290.)  Weber alleges that she is disabled due to bipolar disorder, borderline personality disorder, obesity, sleep apnea, greater trochanteric bursitis, and an internal derangement of both knees. (Opening Br. 2.)  Weber does

---

[2] Weber also contended in her opening brief that the ALJ failed to properly incorporate her finding of a moderate degree of limitation in concentration, persistence, or pace into the hypothetical posed to the vocational expert at step five. (Opening Br. 15-16.)  Weber, however, expressly abandoned this argument in her reply brief, conceding that the Commissioner's position on the matter was correct. (Reply Br. 1.)

[3] In the interest of brevity, this Opinion recounts only the portions of the 1,194-page administrative record necessary to the decision.

not challenge the findings of the ALJ in regard to her physical condition (Opening Br. 3 n.9); consequently, the Court will focus on the evidence pertaining to her mental impairments.

At the hearing, Weber testified that she currently lives with her mother and brother in a one-story home. (Tr. 43.) She is able to perform her self care independently, but does not drive a car. (Tr. 51, 58.) Her typical day involves reading, using the computer, watching television, helping her mother with home tasks, preparing simple meals, and napping in the afternoon; her mother does the grocery shopping and laundry. (Tr. 49-50, 60.) She typically leaves the house twice a week to visit a friend. (Tr. 51.) In her spare time, she enjoys playing cards. (Tr. 51.) She smokes cigarettes but said she gave up alcohol and illegal drugs one to two years earlier, that is, at some point in 2008. (Tr. 58.)

Weber appeared at the hearing using a crutch, stating that she could walk for one-half of a mile, stand for fifteen to twenty minutes at a time, sit for thirty minutes at a time, and lift ten to fifteen pounds.[4] (Tr. 44, 52-54.) She complained that she frequently drops items from her right hand and has difficulty picking up small items with her right index finger. (Tr. 54.) Weber further testified that she has constant pain in her low back and knees, which worsens with sitting or standing for long periods of time, and cannot climb stairs. (Tr. 47.) She takes several medications to reduce her pain, which make her feel tired and dizzy. (Tr. 48.) As to her mental difficulties, Weber testified that she has problems concentrating, feels anxious, and has difficulty spending time with others. (Tr. 55, 57.) She takes medications for her mental disorders, which cause her "sleepiness." (Tr. 57.)

---

[4] Weber was in a motor vehicle accident as a teenager, which caused bilateral knee problems and led to multiple surgeries. (Tr. 26.)

*B. Summary of the Relevant Medical Evidence Pertaining to Weber's Mental Impairments*

Weber was admitted to St. Joseph Hospital on January 30, 2006, because she felt suicidal. (Tr. 275.) She stated that she had been experiencing irregular moods, had been gambling, was using crack cocaine, and had written bad checks. (Tr. 275.) She tested positive for cocaine in a urine drug screen. (Tr. 274.) During her sixteen-day stay, Weber looked for numerous reasons to extend her hospitalization. (Tr. 275.) She was diagnosed with cocaine dependence and borderline personality disorder and assigned a Global Assessment of Functioning ("GAF") score of 30 on admission and 40 upon discharge; she was given a "guarded" prognosis.[5] (Tr. 275.)   On March 1, 2006, Weber was evaluated by Joan Heim at the Bowen Center. (Tr. 567-70.) She reported that she had been using crack cocaine on and off for the past ten years and, in the last two years, on a daily basis. (Tr. 567.) She confided that she supported her drug habit by babysitting for dealers, cleaning their homes, and loaning out her car. (Tr. 567.) She stated, however, that she had been "clean" since her hospitalization one month earlier. (Tr. 567.) Ms. Heim observed that Weber had a depressed affect and mood, but a normal activity level, good memory, and coherent thinking. (Tr. 295.) She recommended that Weber become involved in mental health counseling, a weekly women's group, and AA or NA

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id*. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

meetings, and follow-up with Dr. Fred Lipovitch. (Tr. 570.)

On April 12, 2006, Weber underwent a psychiatric evaluation by Dr. Lipovitch at the Bowen Center. (Tr. 563-66.) On mental status examination, Weber exhibited decreased short term memory and limited insight, but normal judgment and very capable intelligence. (Tr. 306, 565.) She told Dr. Lipovitch that she would like to go to group therapy but could not. (Tr. 564.) He diagnosed her with major depression, recurrent, and bipolar disorder II, depressed, and assigned her a current GAF of 24 and a highest GAF for the past year of 28. (Tr. 566.)

From April 2006 to March 2007, Weber saw a counselor at the Bowen Center approximately eight times. (Tr. 308-35.) She did not, however, attend the women's group or any AA or NA meetings. (Tr. 311-13, 315, 317, 321-32, 348.) A note from Ms. Heim in December 2006 indicated that Weber had missed all twenty-four of her appointments. (Tr. 312, 348.) Nevertheless, in January 2007, Weber indicated that she was ready to begin treatment and that she would attend the women's group meetings. (Tr. 328-82, 348.)

On February 23, 2007, Dr. Rosalind Huang evaluated Weber at the request of the Social Security Administration. (Tr. 290-93.) Weber admitted that she had self-deprecating thoughts, could not concentrate for long periods, had hallucinations, slept sixteen hours a day, and that her energy and motivation varied with her moods. (Tr. 292.) Dr. Huang diagnosed her with bipolar I disorder, mixed, severe, and assigned her a GAF of 50. (Tr. 293.)

In March 2007, Ms. Heim diagnosed Weber with major depressive disorder, recurrent, moderate, unspecified; bipolar II disorder; polysubstance abuse; and pathological gambling. (Tr. 301.) Weber reported that she did not attend AA meetings because of undergoing sinus surgery. (Tr. 328-32, 348.) Ms. Heim told Weber that she could not attend individual therapy until she

regularly attended group therapy and twelve-step meetings. (Tr. 328-32, 348.)

On March 21, 2007, Kenneth Neville, Ph.D., a state agency psychologist, reviewed Weber's record and opined that she had a "marked" limitation in maintaining concentration, persistence, or pace, and in maintaining social functioning; a "moderate" restriction in daily living activities; and one or two episodes of decompensation of extended duration. (Tr. 336.)  He found that Weber met Listing 12.09 for substance addiction disorders, but that her drug and alcohol abuse was material to this finding. (Tr. 336.)  Dr. Neville stated that if Weber stopped her substance abuse, her "remaining mental limitations, if any, would not be disabling." (Tr. 348.)  Dr. Neville's opinion was later affirmed by a second state agency psychologist. (Tr. 457.)

The next day, Weber underwent a psychiatric evaluation by Dr. Valsa Ouseph, who observed that Weber had a blunted affect, racing thought flow, rambling speech, fearful and dysphoric mood, fair insight and judgment, intact calculation skills, and average intelligence. (Tr. 425-28.)  Dr. Ousep diagnosed her with bipolar disorder, alcohol dependence, and cocaine dependence, and assigned her a GAF of 52. (Tr. 428.)  Weber saw Dr. Ousep again on April 27, 2007, complaining that she heard voices and felt anxious and paranoid; Dr. Ousep continued her medications and psychotherapy with Ms. Heim. (Tr. 418.)  However, the next month Ms. Heim noted that Weber was still not attending group therapy because of her many health problems. (Tr. 405.)

Weber saw D. Cooper, a psychotherapist at Psychiatric Care, Inc., one to two times a month from July 2007 to April 2009. (Tr. 414-16, 420-23, 465-68, 589, 578-87.)  She was administered the Beck Depression Inventory and the Burns Anxiety Inventory in August 2007, and both scores were severe. (Tr. 414, 420-23.)  In September and October 2007, Mr. Cooper

stated that Weber was "marginally functioning"; in November, however, he documented that her mood was stable. (Tr. 465-67.) In January and February 2008, Mr. Weber reported that Weber's mood was moderately depressed and that she was anxious. (Tr. 468, 589.)

Weber was also under the care of Dr. Bryan Flueckiger, a psychiatrist at Psychiatric Care, Inc., from March 2007 to May 2009. (Tr. 469, 488-95, 545-56, 590, 592.) In January 2008, Dr. Flueckiger documented that Weber was in good spirits but continued to experience "lots of symptoms," including nightmares, anxiety, and feeling trapped in her living situation; he also noted that she was somewhat "medication-seeking." (Tr. 469.)

On February 16, 2008, Weber was admitted to St. Joseph Hospital for a four-day stay due to a partial relapse of polysubstance abuse and recent self-harm ideations. (Tr. 471-73.) Dr. Steven Schneider assigned her a diagnosis of bipolar disorder, NOS; rule out recurrent major depression; polysusbstance abuse in partial relapse; and borderline personality disorder. (Tr. 472.) Her GAF was 15 upon admission and 40 upon discharge. (Tr. 472.)

In April 2008, Mr. Cooper reported that Weber was very depressed and had fleeting suicidal ideation, together with anxiety and panic symptoms. (Tr. 586-87.) In June 2008, Dr. Flueckiger completed a medical source statement for Weber, reflecting a diagnosis of bipolar disorder II and borderline personality disorder and a "fair" prognosis. (Tr. 488-95.) He stated that her current GAF was 40 and her lowest GAF for the past year was 15 and that she suffered from severe symptoms of depression and anxiety, including insomnia, low self-esteem, fatigue, confusion, social withdrawal, irritability, stress, racing thoughts, and mood swings. (Tr. 488-89.) He opined that she would miss more than three days a month due to her psychiatric problems and that her ability to work in any capacity, currently or in the near future, "d[id] not appear

realistic." (Tr. 495.)

On October 1, 2008, Weber was voluntarily admitted to St. Joseph Hospital because she felt suicidal. (Tr. 594.)  A urine drug screen was positive for opiates and cocaine. (Tr. 594.)  She appeared needy, dependent, and "very comfortable" on the unit, but was stable upon discharge. (Tr. 595-96.)  Weber was assigned a GAF of 35 upon admission and 58 upon discharge, and was diagnosed with bipolar disorder, depressed; polysubstance abuse, continuous; and borderline personality disorder. (Tr. 595.)

In November 2008, Weber reported to Mr. Cook that she was unable to attend AA meetings due to lack of transportation. (Tr. 582.)  Her mood was not as helpless, but she had sporadic suicidal intent. (Tr. 582.)  In December, she appeared depressed and disheveled with unkempt hair. (Tr. 581.)  In January 2009, Mr. Cook documented that Weber's mood was stable and her affect slightly brighter. (Tr. 580.)  Nevertheless, in April, Weber complained of increasing depression and anxiety. (Tr. 578.)

In March 2009, Dr. Flueckiger noted that Weber's speech was generally good with some rambling. (Tr. 545.)  He found that she appeared depressed and hopeless. (Tr. 545.)  He gave her a "poor" prognosis and stated that she was not able to work at all and that he did not expect her to be employable in the near future. (Tr. 545.)  He noted that she had been suicidal three weeks ago; isolated herself at home; appeared depressed, anergic, and hopeless; and had a "poor" prognosis. (Tr. 545.)  He also documented, however, that Weber had unimpaired cognition, intact memory, and fair insight and judgment, and that she maintained attention during his session. (Tr. 545.)  The next month, Dr. Flueckiger signed a statement representing that Weber was "totally disabled without consideration of any past or present drug and/or alcohol use" and

that drug or alcohol use was "not a material cause" of her disability. (Tr. 547.)

On June 2, 2009, Dr. Flueckiger completed another medical source statement, indicating a diagnosis of bipolar disorder, NOS; polysubstance dependence, episodic; and borderline personality disorder. (Tr. 549-56.)  He documented that she had primarily "mild" and "moderate" mental limitations in areas of understanding and memory, sustaining concentration and persistence, social interactions, and adaptation, but "marked" limitations in her ability to perform activities within a schedule, maintain regular attendance, and complete a normal workweek without interruption from psychologically based symptoms. (Tr. 552-53.)  He also represented that she had no energy, isolated herself, was hopeless, and had suicidal ideation. (Tr. 551.)  Dr. Flueckiger assigned Weber a current and highest-past-year GAF of 55; stated that her prognosis was "poor" and that she was incapable of tolerating even "low stress" work; and indicated that she would miss work more than three days a month due to her mental impairments. (Tr. 549.)  He  also reported that Weber had been dismissed from his practice a month earlier due to frequent missed or cancelled appointments. (Tr. 556.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

"When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the [ALJ] is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628-29 (7th Cir. 2006) (citations omitted); *see* 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). "If so, she is deemed disabled independent of [her] drug addiction or alcoholism and is therefore entitled to benefits." *Kangail*, 454 F.3d at 629 (citations omitted); *see* 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).

### B. The ALJ's Decision

On December 11, 2009, the ALJ rendered the decision that ultimately became the Commissioner's final decision. (Tr. 16-32.) She found at step one of the five-step analysis that Weber had not engaged in substantial gainful activity since her alleged onset date, and at step two, that Weber's alcohol and drug dependence, bipolar disorder, sleep apnea, greater trochanteric bursitis, internal derangement bilateral knees, and obesity were severe impairments.

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

(Tr. 22.)

At step three, the ALJ determined that Weber's mental impairments, including her substance abuse disorder, met Listing 12.04 (affective disorders) and Listing 12.09 (substance addiction disorders). (Tr. 23.)  The ALJ further articulated, however, that if Weber stopped the substance abuse, she would continue to have a severe impairment or combination of impairments but they would not meet or equal a listing. (Tr. 23.)

Before proceeding to step four, the ALJ determined that Weber's testimony of debilitating limitations was "not credible" to the extent they were inconsistent with the following RFC:

> If the claimant stopped the substance abuse, [she] would have the residual functional capacity to perform a restricted range of sedentary work as follows: lift, carry, push and pull 10 pounds occasionally; sit or stand at will; occasionally balance, stoop, crouch, crawl, kneel, and climb stairs and ramps; never climb ladders, ropes and scaffolds; only simple, repetitive tasks due to moderate limits in the ability to maintain attention and concentration; no work in close proximity to others; only routine, occasional contact with supervisors; and only occasional public contact.

(Tr. 25.)

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that even if Weber stopped the substance abuse, she would be unable to perform any of her past relevant work. (Tr. 30.)  The ALJ then concluded at step five that if Weber stopped the substance abuse, she could perform a significant number of unskilled sedentary jobs within the economy, including benchworker, assembler, and brake lining coater. (Tr. 31.)  Because the ALJ determined that Weber's substance abuse disorders were a contributing factor to the determination of disability, her claims for DIB and SSI were denied. (Tr. 31-32.)

*C. Discussion*

Weber asserts that she is entitled to a remand of the Commissioner's final decision because the ALJ improperly evaluated the opinions of Dr. Flueckiger, her treating psychiatrist. Weber's argument, at least with respect to the opinions that Dr. Flueckiger rendered in 2009 when there is no evidence that she was still using illegal drugs or alcohol, has merit.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 404.1527(d); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Of course, contrary to many eager claimants' arguments, a claimant is not entitled to DIB

simply because her treating physician states that she is "unable to work" or "disabled." *Clifford*, 227 F.3d at 870. The determination of disability is reserved to the Commissioner. *Id.*; *see Dixon*, 270 F.3d at 1177l; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the ALJ assigned "greatest weight" to the opinion of the state agency psychologists rendered in 2007 and rather conclusorily recited that the opinion was "most consistent with the evidence of record." (Tr. 29.) In doing so, the ALJ assigned "little weight" to the four opinions provided by Dr. Flueckiger, the psychiatrist who treated Weber from March 2007 to May 2009, offering various reasons for discounting each opinion. (Tr. 29-30.) The Court will address each of the ALJ's reasons in turn.

To begin, the ALJ discounted Dr. Flueckiger's June 2008 opinion because the evidence suggested that Weber was still using substances during this time period. (Tr. 29.) Indeed, it is undisputed that Weber used substances, at least intermittently, through October 2008, as she had positive drug screens in February and October 2008. Consequently, the inference that the ALJ made in connection with discounting Dr. Flueckiger's June 2008 opinion—that since Weber was using substances in February and October 2008, she likely was using substances, at least on an intermittent basis, in June 2008 when Dr. Flueckiger rendered his opinion—is reasonable. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him). Therefore, substantial evidence supports the ALJ's discounting of the opinions rendered by Dr. Flueckiger prior to October

2008, because as the ALJ reasonably inferred, they likely were "not descriptive of the claimant's abilities in the absence of drug and alcohol use." (Tr. 29); *see Kangail*, 454 F.3d at 629 (explaining that a claimant must prove she is disabled independent of her drug addiction or alcoholism).

The opinions rendered by Dr. Flueckiger in 2009, however, are not so easily disposed of, as there is no indication in the record that Weber was using substances in 2009. To review, Dr. Flueckiger opined in 2009 that Weber had "marked" limitations in her ability to complete a normal workweek without interruption from psychologically based symptoms, maintain regular attendance, and perform activities within a schedule. (Tr. 29, 552-53.) More specifically, he opined that Weber would miss more than three days of work per month due to her mental impairments. (Tr. 556.) Significantly, the vocational expert testified that an individual cannot maintain competitive employment if she misses more than one or two days of work per month. (Tr. 66.)

The ALJ discounted Dr. Flueckiger's 2009 opinions for several reasons. She viewed Dr. Flueckiger's opinion that Weber was "totally disabled" as inconsistent with some of his own medical findings, Weber's admission that cocaine use makes her more paranoid, other treatment notes indicating that drugs and alcohol worsen her depression, her activities of daily living, and the GAF score of 55 assigned by Dr. Flueckiger. (Tr. 29-30.) Many of these reasons offered by the ALJ, however, do not create a "logical bridge" between the evidence of record and her conclusion to discount Dr. Flueckiger's opinions. *Collins v. Astrue*, 324 F. App'x 516, 521 (7th Cir. 2009) (unpublished) (citing *Moss*, 555 F.3d at 561).

First, the ALJ considered Dr. Flueckiger's March 2009 assertion that Weber was "unable

15

to function" inconsistent with his findings in the same progress note that she had unimpaired cognition; intact memory; fair insight and judgment; logical and organized thoughts, although slow; and could focus for the entire session. (Tr. 29.)  The ALJ, however, did not mention that Dr. Flueckiger *also* documented that Weber had been suicidal three weeks earlier; was isolating herself at home in her room; had "up and down moods"; remained depressed, hopeless, and anergic; and had a "poor" prognosis. (Tr. 545.)  Of course, "[a]n ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)); *see Punzio v. Astrue*, 630 F.3d 704, 710-11 (7th Cir. 2011) (finding that the ALJ had "cherry-picked" her treating physician's file to locate a treatment note that undermined the physician's assessment of the claimant's functional limitations, demonstrating a fundamental misunderstanding of the episodic nature of mental illness).

    Next, the ALJ discounted Dr. Flueckiger's April 2009 opinion, which stated that Weber's drug or alcohol use was not a material cause of her disability, finding it inconsistent with Weber's own admission that cocaine use made her more paranoid and other treatment notes indicating that drug or alcohol use increases her depression. (Tr. 30.)  The evidence of record does indeed indicate that Weber's use of substances tends to increase her symptoms of paranoia and depression. (*See, e.g.*, Tr. 305-06, 568.)  However, "the fact that substance abuse aggravated [Weber's] mental illness does not prove that the mental illness itself is not disabling." *Kangail*, 454 F.3d at 629; *accord Morgan v. Astrue*, 393 F. App'x 371, 375 (7th Cir. 2010) (unpublished). In fact, as acknowledged in *Kangail*, "bipolar disorder can precipitate substance abuse, for

example as a means by which the sufferer tries to alleviate her symptoms." 454 F.3d at 629.

The ALJ also cited Weber's daily living activities when discounting Dr. Flueckiger's April 2009 opinion, perceiving them as inconsistent with an assertion of "total disability." (Tr. 30.) The ALJ, however, failed to explain this purported inconsistency, as Weber's daily activities appeared no more than minimal in nature and, of course, "bipolar disorder is episodic." *Kangail*, 454 F.3d at 629; *see Punzio*, 630 F.3d at 712 (reminding that an "ability to struggle through the activities of daily living does not mean that [a claimant] can manage the requirements of a modern workplace"); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) (stating that the ability to engage in activities of daily living "need not translate into an ability to work full time," but may mean nothing more than that the claimant "can survive outside a mental institution or halfway house"); *Bauer*, 532 F.3d at 608 (articulating that the ALJ's citation of plaintiff's minimal daily activities, including performance of household chores and caring for her teenage son, when discounting a doctor's opinion equated to saying merely that "the plaintiff is not a raving maniac who needs to be locked up"). Moreover, Weber's mother and brother reported that some days Weber spends most of the day sleeping. (Tr. 213, 225.)

Finally, the ALJ discounted Dr. Flueckiger's June 2009 opinion, which reiterated Weber's inability to hold a job; assigned her a GAF score of 55; and imposed "mild" and "moderate" limitations in most areas, but "marked" limitations in her ability to complete a normal workweek without interruption from psychologically based symptoms, maintain regular attendance, and perform activities within a schedule. (Tr. 29, 552-53.) The ALJ purported that a GAF score of 55 was inconsistent with the enumerated "marked" limitations concerning Weber's ability to maintain a schedule. (Tr. 30.)

However, as the Seventh Circuit has explained, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio*, 630 F.3d at 710 (collecting cases). As articulated earlier, the vocational expert testified that no employer would hire Weber if her mental illness causes her to experience as few as three "bad days" a month that result in her missing work. *Id.*; *see Bauer*, 532 F.3d at 609 ("Suppose that half the time [the claimant] is well enough that she could work, and half the time she is not. Then she could not hold down a full time job."). In fact, by June 2009, Dr. Flueckiger had discharged Weber from his care due to her failure to appear for numerous appointments, lending credence to his assignment of "marked" limitations in her ability to adhere to a schedule.

In the end, "[a]n ALJ must offer 'good reasons' for discounting a treating physician's opinion." *Campbell*, 627 F.3d at 306 (quoting *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010)); *see* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). Here, some of the reasons provided by the ALJ for discounting Dr. Flueckiger's opinions appear less than sound. *See Jelinek v. Astrue*, __ F.3d __, 2011 WL 5319852, at *6 (7th Cir. Nov. 7, 2011) ("We have made clear that what matters are the reasons articulated *by the ALJ*." (emphasis in original)); *Mirza v. Barnhart*, No. 00 C 8003, 2002 WL 731781, at *7 (N.D. Ill. Apr. 25, 2002) ("[T]he Commissioner's decision must stand or fall with the reasons set[] forth in the ALJ's decision.").

As an additional concern, the ALJ relied on the opinions of the state agency psychologists rendered in 2007 when Weber was still using substances. Dr. Flueckiger's 2009 opinions—when Weber purportedly was "clean"—were not reviewed by the state agency physicians. Therefore, Dr. Flueicker's opinions were essentially uncontradicted for the time

18

period that Weber was "clean" from illegal drug or alcohol use. *See Campbell*, 627 F.3d at 309; *Jelinek*, 2011 WL 5319852, at *6 (advising that an ALJ would be "hard-pressed to justify casting aside" a recent treating psychiatrist's opinion in favor of a state agency psychologists' opinion dated two years earlier).

In sum, for the foregoing reasons, the ALJ's discounting of all of the opinions of Weber's treating psychiatrist, Dr. Flueckiger, is not supported by substantial evidence. Accordingly, the Commissioner's final decision will be remanded for reconsideration of the medical source opinions of record in accordance with 20 C.F.R. §§ 404.1527(d) and 416.927(d).[7]

---

[7] Because a remand is warranted for reconsideration of the medical source opinions, the Court need not reach Weber's second challenge—that the ALJ erred when discounting Weber's credibility for failing to attend outpatient counseling, group therapy, and AA and NA meetings without first inquiring about her reasons for doing so. Nevertheless, the Court will briefly comment on the argument.

Social Security Ruling 96-7p states that a claimant's testimony may be less credible if "the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." It further cautions, however, that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p; *see Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); *Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1203 (N.D. Ill. 2005); *Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1097 (E.D. Wis. 2001). Here, despite the fact that the ALJ seemed to heavily rely upon Weber's failure to consistently comply with treatment to discredit her, the ALJ never asked her at the hearing why she failed to consistently attend counseling, group therapy, or AA or NA meetings. *See Brown v. Barnhart*, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004) (stating that the ALJ "may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner"); *Brennan-Kenyon v. Barnhart,* 252 F. Supp. 2d 681, 697 (N.D. Ill. 2003) (remanding case where the ALJ failed to adequately develop the record concerning the claimant's reasons for not seeking medical treatment); *Anderson v. Barnhart*, No. 01 C 5083, 2002 WL 314410, at *9 (N.D. Ill. Feb. 28, 2002) (same).

In any event, "it is questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)). "Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment[.]" *Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135 (N.D. Ala. 2006). Indeed, "mental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail*, 454 F.3d at 630 (internal citations omitted). The ALJ's credibility determination leaves the Court wondering whether she considered the episodic nature of Weber's mental health condition when determining her credibility. *See generally Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (emphasizing that when important evidence is left unmentioned by the ALJ, the Court is "left to wonder whether the [evidence] was even considered" at all).

19

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Weber and against the Commissioner.

SO ORDERED.

Enter for this 2nd day of December, 2011.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge